IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

**AUDREY HUDSON**
4728 Idlewilde Rd.
Shady Side, MD 20764

    and

**THE WASHINGTON TIMES, LLC**
3600 New York Ave., NE
Washington, DC 20002                        Civil Action No. _____

    Movants,

    vs.

**UNITED STATES DEPARTMENT OF**
**HOMELAND SECURITY**
425 Murray Lane, Bldg. 410
Washington, DC 20528

    Respondent.

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR RETURN OF PROPERTY**

Audrey Hudson and The Washington Times, LLC, move for the return of their property

that has been unlawfully seized by agents of the Respondent, in violation of the Fourth and First

Amendments to the Constitution of the United States. The property unlawfully seized by the

Respondent from the residence of Ms. Hudson comprises confidential notes, draft news articles,

and related internal communications prepared by Ms. Hudson in her capacity as a journalist

employed by The Washington Times. The seized materials identify confidential sources and

record or constitute information provided by those sources. Movants seek the return of these

materials, including all photocopies thereof made by agents of the Respondent. Movants also

seek an Order directing that all records of any kind in the possession or control of the

Respondent containing information derived from the unlawfully seized materials be delivered to the Court for destruction under its supervision.

## LEGAL STANDARD

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV. "[T]he [Supreme] Court has made clear that the context of the First Amendment intensifies the Fourth Amendment concerns that may be present" when government investigations impinge upon the constitutionally guaranteed right to freedom of expression. *In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1297 (4th Cir. 1987) *rev'd in part, remanded by United States v. R. Enters, Inc.*, 498 U.S. 292 (1991). Hence, Congress has enacted the Privacy Protection Act of 1980 which provides, in pertinent part, that it is unlawful "for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper." 42 U.S.C. § 2000aa (West 2013).

The Federal Rules of Criminal Procedure provide:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed. R. Crim. P. 41(g).

"When a motion for return of property is made before an indictment is filed (but a criminal investigation is pending), the movant bears the burden of proving both that the seizure was illegal and that he . . . is entitled to lawful possession of the property." *In re Grand Jury*

*Subpoena Duces Tecum Issued to Roe & Roe, Inc.*, 49 F. Supp. 2d 451, 453 (D. Md. 1999). If, however, no criminal charges have been brought, the movant need only show he is entitled to lawful possession of the property. *See, e.g., United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (noting 1989 amendment to Rule 41 "was designed to expand the rule's coverage to include property lawfully seized"); *Savoy v. United States*, 604 F.3d 929, 932-33 (6th Cir. 2010) ("the person seeking return of property must show that they are lawfully entitled to possess it"); *In re Search of Office of Tylman*, 245 F.3d 978, 980 (7th Cir. 2001) (holding "motion may be made whether or not the search was lawful"); *see also* 3A Fed. Prac. & Proc. Crim. § 690 (4th ed.) ("In order to file a motion for return, the seizure need not have been unlawful").

"Once the movant makes out a prima facie case of lawful entitlement, the burden shifts to the government to show that it has a legitimate reason to retain the property." *United States v. Lindsey*, 202 F.3d 261 (4th Cir. 2000). This burden must be satisfied by a preponderance of the evidence. *See, e.g., United States v. Dean*, 100 F.3d 19, 21 (5th Cir. 1996). To the extent there is "any factual issue necessary to decide the motion," the court reviewing a motion for return of property "***must*** receive evidence." Fed. R. Crim. P. 41(g) (emphasis added).

## BACKGROUND

1.     Audrey Hudson (hereinafter "**Hudson**") resides at 4728 Idlewilde Rd.; Shady Side, Maryland 20764.

2.     The Washington Times, LLC (hereinafter "**The Washington Times**") is a limited liability company registered under the laws of the State of Delaware, and its principal place of business is located at 3600 New York Ave., NE, Washington, District of Columbia 20002. The Washington Times publishes The Washington Times newspaper.

3.      Respondent United States Department of Homeland Security (hereinafter "**DHS**")
is an agency of the United States federal government.

**Hudson's Work with The Washington Times**

4.      Hudson is a veteran Washington, D.C. reporter and award winning journalist who
was employed with The Washington Times between 1999 and 2009.

5.      The Washington Times is a newspaper of general circulation in the District of
Columbia, known for its thorough political reporting and opinion pieces by, among others,
prominent political leaders.

6.      In December 2004, Hudson wrote an investigative story for The Washington
Times critical of the Transportation Security Administration (hereinafter "**TSA**") and the Federal
Air Marshal Service (hereinafter "**FAMS**").  *See Dress code wearing thin on air marshals*,
Wash. Times, Dec. 8, 2004, at A01, *available at* http://www.washingtontimes.com/news/2004/
dec/8/20041208-122555-6114r (attached hereto as Exhibit A).  Hudson reported that a strict
dress code for air marshals was compromising their undercover status.  *See id.*  In March 2005,
Hudson wrote another story for The Washington Times that was critical of TSA and FAMS.  *See
Flight marshal numbers disputed*, Wash. Times, Mar. 3, 2005, at A01, *available at* http://
www.washingtontimes.com/news/2005/mar/3/ 20050303-123754-2141r (attached hereto as
Exhibit B).  The story detailed how air marshals were protecting less than 10 percent of domestic
and international flights during the month of December 2004.  Hudson wrote a related story for
The Washington Times that was published on March 10, 2005.  *See Air marshals' coverage said
inflated*, Wash. Times, Mar. 10, 2005, at A09, *available at* http://www.washingtontimes.com/
news/2005/mar/9/20050309-112254-1647r (attached hereto as Exhibit C).  The information that
Hudson and others reported regarding deficiencies in aviation security led to a Congressional

investigation of FAMS. *See* H. Comm. on the Judiciary, 109th Cong., *Plane Clothes: Lack of Anonymity at the Federal Air Marshal Service Compromises Aviation and National Security* (Comm. Print 2006).

      7.    During the period from 2004-2009, Hudson continued to investigate security and operational deficiencies within FAMS, and throughout TSA and DHS. Hudson authored numerous critical stories regarding these matters that were published by The Washington Times.[1]

---

[1] *Flight security stiffened after failed plot*, Wash. Times, Dec. 27, 2009, at A01; *Airports manual leak stirs concern*, Wash. Times, Dec. 16, 2009, at A05; *Marshal's sex trial seen as threat to air safety; official fears backlash*, Wash. Times, Nov. 6, 2009, at A01; *Feds probe why pilots overshot airport; alcohol, drugs not checked*, Wash. Times, Oct. 24, 2009, at A01; *Screeners get OK for masks in a reversal; U.S. flu cases climb to 155, with 1 death*, Wash. Times, May 2, 2009, at A01; *TSA probes treating of Ron Paul official*, Wash. Times, Apr. 6, 2009, at A01; *Gun program for pilots set for expansion, officials insist; backers take exception to inaccurate editorial*, Wash. Times, Mar. 24, 2009, at A03; *Napolitano inquiring into unionizing of airport screeners*, Wash. Times, Feb. 26, 2009, at A02; *Air Marshal Service aces GAO report; changes spur rebound at the fledgling agency*, Wash. Times, Feb. 14, 2009, at A01; *Whistleblowers seek protection; air marshals who challenged procedures lost their careers*, Wash. Times, Feb. 2, 2009, at A01; *TB data shared too late to stop traveler; GAO finds border open to Mexican*, Wash. Times, Nov. 14, 2008, at A01; *Sheriff probes theft of security laptop; frequent fliers' data put at risk*, Wash. Times, Aug. 13, 2008, at A03; *Missing laptop found, firm eyed; contained air passenger data*, Wash. Times, Aug. 6, 2008, at A03; *Agreement for "respectful" treatment of troops reached*, Wash. Times, July 24, 2008, at A10; *Foreign students labeled "threats"; TSA wording raises alarm*, Wash. Times, June 23, 2008, at A01; *Feingold presses Bush on marshals; checks reform of no-fly list*, Wash. Times, May 2, 2008, at A01; *Air marshals grounded in list mix-ups; share names with terrorism suspects*, Wash. Times, Apr. 30, 2008, at A01; *Activists suspect bias by screeners; video scrutiny of TSA urged*, Wash. Times, Apr. 9, 2008, at A04; *Security flap arises over nipple ring removal*, Wash. Times, Mar. 29, 2008, at A03; *Faulty rules blamed for gun's firing; pilot tried to lock weapon while landing*, Wash. Times, Mar. 28, 2008, at A01; *California airport isolates troops; flight back from Iraq parked 400 yards away*, Wash. Times, Oct. 3, 2007, at A04; *Toys to merit more scrutiny at security; airlines urge fliers to check gadgets with remote controls*, Wash. Times, Oct. 2, 2007, at A07; *TSA screeners found to cheat; probe expands*, Wash. Times, Sept. 28, 2007, at A06; *Airport T-shirt prompts suit; TSA employee asked man to cover Arabic phrase*, Wash. Times, Aug. 11, 2007, at A03; *TSA warns of terror "dry runs" at airports*, Wash. Times, July 26, 2007, at A03; *Security on alert ahead of attacks*, Wash. Times, July 3, 2007, at A01; *Trash find prompts reminder to shred; officials warned on sensitive data*, Wash. Times, June 21, 2007, at A09; *US Airways cites TSA guidelines in response to imams*, Wash. Times, May 31, 2007, at A06; *Report confirms terror dry run; government handling hit*, Wash. Times, May 30, 2007, at A01; *Airports keep security tight over holiday; TSA cautions travelers*, Wash. Times, May 26, 2007, at A01; *TSA hard drive with employee data missing; FBI probes "serious" breach*, Wash. Times, May 5, 2007, at A03; *Imams booted from US Airways flight file lawsuit*, Wash. Times, Mar. 14, 2007, at A03; *Marshals book trans-Atlantic flights; bomb cache, arrest spur tactic*, Wash. Times, Mar. 10, 2007, at A01; *Homeland Security moves to increase armed pilots*, Wash. Times, Feb. 2, 2007, at A03; *Holiday pies won't fly this year; similarities to gels, aerosols seen as security risks*, Wash. Times, Dec. 21, 2006, at A03; *British pilots say no to armed marshals*, Wash. Times, Dec. 17, 2006, at A02; *Muslim pilgrim surged to complain; "airport profiling" seen as concern*, Wash. Times, Dec. 13, 2006, at A01; *Imams seek to settle with airline; Muslim group hired as counsel*, Wash. Times, Dec. 11, 2006, at A01; *Imam disputes tie to Hamas; "true Muslims not terrorists"*, Wash. Times, Dec. 1, 2006, at A01; *Marshals decry imams' charges; fliers may not report suspicions*, Wash. Times, Nov. 29, 2006, at A01; *How the imams terrorized an airliner; clerics protest bump from Flight 300*, Wash. Times, Nov. 28, 2006, at A01; *Marshals kept off plane at Reagan; team "denied boarding" after gate agent asks for wrong paperwork*, Wash. Times, Nov. 20, 2006, at A01; *Ex-air marshal to sue over "SSI" label*, Wash. Times, Oct. 30, 2006, at A04; *Report hits preparedness to protect transport systems; absence of plan seen hurting TSA functioning*,

8.     In the course of conducting her investigation of security and operational

deficiencies within DHS, TSA and FAMS, Hudson communicated with a number of confidential

sources who were current or former federal government employees.  The names of certain of

these confidential sources, and the information they provided, were recorded or maintained by

Hudson in file folders.  Hudson also maintained in these file folders her research notes, drafts of

news articles, materials received from confidential sources, and communications with her editors

at The Washington Times.  Hudson stored five of these working file folders in her home office at

her residence in Shady Side, Maryland.

---

Wash. Times, Oct. 6, 2006, at A06; *Screeners allow small amounts of liquid; "common-sense approach" taken to security on airlines*, Wash. Times, Sept. 26, 2006, at A03; *Air marshals' injuries raise lawmaker's concern*, Wash. Times, Sept. 21, 2006, at A01; *Air marshals ousted over job injuries; federal force cut in half; safety policies delayed*, Wash. Times, Sept. 20, 2006, at A01; *Airline-security incidents seen as terrorist feints*, Wash. Times, Sept. 4, 2006, at A01; *12 on U.S. flight detained in Amsterdam; passengers attempted to use cell phones after takeoff*, Wash. Times, Aug. 24, 2006, at A13; *Radio chips leave visa data unsecured; Homeland vows to safeguard systems*, Wash. Times, Aug. 22, 2006, at A04; *Flight passengers describe hours of bizarre behavior; woman cited al Qaeda, urinated*, Wash. Times, Aug. 18, 2006, at A05; *United plane diverted from Dulles; military jets escort London flight to Boston airport after disruption*, Wash. Times, Aug. 17, 2006, at A03; *Terror roundup widens; it's still safe to fly, says DHS chief*, Wash. Times, Aug. 12, 2006, at A01; *New chief targets air marshal morale but rank and file see few results*, Wash. Times, Aug. 6, 2006, at A02; *Air marshals warn their bullets are too powerful; House panel completes probe of in-flight "danger"*, Wash. Times, June 13, 2006, at A01; *TSA tries to classify report; air marshals' policies rapped*, Wash. Times, June 8, 2006, at A11; *Probe finds air marshals at risk; dress code compromises anonymity*, Wash. Times, May 20, 2006, at A01; *TSA protects report on feared terror practice*, Wash. Times, Apr. 25, 2006, at A03; *Chertoff criticized over budget lawmakers fret about shortfalls on security needs*, Wash. Times, Feb. 17, 2006, at A07; *Air marshals wait for new director; many eyed Border Patrol move*, Wash. Times, Jan. 19, 2006, at A03; *Air marshal chief resigns to "start enjoying life"; salutes "dedication and performance" of 2,000-strong force*, Wash. Times, Jan. 6, 2006, at A03; *Relaxing of airline screening defended aim is to lessen staff workload*, Wash. Times, Dec. 28, 2005, at A04; *Chertoff seeks end of failed policies; alien detention policy revisited*, Wash. Times, Dec. 21, 2005, at A09; *White House backs marshals in shooting*, Wash. Times, Dec. 9, 2005, at A06; *Air marshals kill passenger; boast of bomb on plane provokes shooting in Miami*, Wash. Times, Dec. 8, 2005, at A01; *30,000 fliers seek watch-list removal*, Wash. Times, Dec. 8, 2005, at A11; *GAO faults results of anti-terror training*, Wash. Times, Dec. 4, 2005, at A02; *U.S. seeks to let air passengers keep shoes on agency calls for effective, but hassle-free technology*, Wash. Times, Aug. 10, 2005, at A01; *Air marshals sue Homeland Security over rules*, Wash. Times, June 4, 2005, at A02; *Passengers describe flight as a terrorist dry run; officials questioning Syrians didn't notice their expired visas*, Wash. Times, Apr. 27, 2005, at A09; *Marshal files suit, gets his job back, had criticized federal agency*, Wash. Times, Apr. 26, 2005, at A12; *Bills would ban sales of guns with watch lists; critics see breach of Second Amendment*, Wash. Times, Apr. 8, 2005, at A04; *GAO to release evaluation of Secure Flight system; lawmakers wary of screening using personal, consumer data*, Wash. Times, Mar. 28, 2005, at A03; *Private aircraft seen as new terror target*, Wash. Times, Mar. 15, 2005, at A04; *Pilots group insists safety since 9/11 still inadequate*, Wash. Times, Mar. 11, 2005, at A11; *Air marshals' coverage said inflated Ex-FAA official claims agency is fudging figures*, Wash. Times, Mar. 10, 2005, at A09; *Flight marshal numbers disputed Agents criticize data "padding"*, Wash. Times, Mar. 3, 2005, at A01; *Board will review air marshal dress code, complaints*, Wash. Times, Feb. 4, 2005, at A05; *"Inch of snow" shuts down air marshals operation grounded for 8 hours*, Wash. Times, Jan. 21, 2005, at A01; *Agency drops nondisclosure rule for workers training set on unclassified data*, Wash. Times, Jan. 18, 2005, at A07; *Dress code wearing thin on air marshals*, Wash. Times, Dec. 8, 2004, at A01; *Scouting jetliners for new attacks*, Wash. Times, July 22, 2004, at A01.

9.      The notes, draft articles, and other documents prepared or obtained by Hudson in the course of researching, investigating or authoring news stories for The Washington Times are the property of The Washington Times.

**Warrant Issued to Search Hudson's Residence**

10.      On August 5, 2013, a district court in Haverford County Maryland issued a warrant authorizing Maryland State Police to enter and search Hudson's residence at 4728 Idlewilde Road, Shady Side, Anne Arundel County, Maryland 20764.  *See* Warrant (attached hereto as Exhibit D).  On information and belief, the State Police were solicited to procure the warrant by one or more officials of the U.S. Coast Guard Investigative Service (hereinafter "**CGIS**"), a component of DHS.

11.      The Warrant was issued on the basis of an affidavit alleging that Hudson's spouse, Paul Roland Flanagan (hereinafter "**Flanagan**") had violated various firearm possession laws.  *See* Affidavit (attached hereto as Exhibit E).  The affiant officer asserted that Flanagan was "prohibited from possessing any firearms due" to two 30-year-old criminal convictions.  Affidavit [Ex. E] at 6.

12.      The Affidavit did not assert any wrongdoing on Hudson's part.  Nor does the Affidavit set forth any basis for searching or seizing journalist's work product belonging to Hudson or The Washington Times.

13.      The Warrant authorized the Maryland State Police to do the following:

      a.      Enter and search 4728 Idlewilde Rd, Shady Side, Anne Arundel County, Maryland 20764;

      b.      Seize all evidence to include:

            i.      "All instrumentalities of the afore-mentioned crimes";

      ii.     Any and all firearms and firearm accessories/parts;

      iii.    Ammunition, magazines, holsters, and firearm related equipment;

      iv.    Receipts and purchase orders of firearms and firearm accessories;

      v.     Indicia of occupancy of the residence; and

      vi.    Contraband liable to seizure under Maryland law;

   c.    Seize and/or view "all evidence including ledgers, logs, telephone";

   d.    Seize and examine electronic data; and

   e.    Seize personal property to establish the identity of the person(s) in control of the premises. *See* Warrant [Ex. D] at 1.

14.    The Warrant did not, however, authorize the search or seizure of records, files, or documents unrelated to Flanagan's alleged firearms possession. *See id.* Plainly, the Warrant did not authorize the search or seizure of journalist's work product belonging to Hudson and The Washington Times. *See id.*

**August 6th, 2013 Execution of the Warrant**

15.    At approximately 4:30 a.m. on August 6, 2013, State Police conducted a search of Hudson's residence. The State Police were accompanied by a federal agent with the CGIS named Miguel Bosch (hereinafter **"Bosch"**). On information and belief, prior to joining the CGIS Bosch served as a federal air marshal within FAMS.

16.    Hudson's residence is a two-story, three bedroom house. All of the bedrooms are located on the second level of the residence. One of the bedrooms is used as a master bedroom and another is used as a guest room.

17.    The remaining bedroom is used by Hudson as a home office and work area. There is a desk with drawers in Hudson's home office. There are also several filing cabinets and

boxes in the area adjacent to Hudson's desk, and in a closet within Hudson's home office.  The

desk, filing cabinets and boxes contained numerous file folders, documents, photographs, tablets

and other materials.  Of the numerous file folders stored in the filing cabinets and boxes within

Hudson's home office on August 6, 2013, at least five of the file folders contained journalist's

work product relating to Hudson's investigative reporting for The Washington Times.  As

described below, those five file folders contained materials relating to Hudson's investigation of

security and operational deficiencies within DHS, TSA and FAMS.

      18.    Shortly after the early morning search began, CGIS Agent Bosch asked Hudson if

she was "one and the same Audrey Hudson" who had written news stories about FAMS for The

Washington Times.  Hudson responded that she was The Washington Times reporter who had

written these news stories.  Bosch also named certain individuals who were working, or had

worked, within TSA and/or FAMS, and asked Hudson if she was familiar with those individuals.

      19.    The State Police and Bosch completed their search of Flanagan's and Hudson's

residence in approximately three hours.  The State Police confiscated firearms, ammunition and

firearm accessories as specified in the Warrant.  In addition, the law enforcement officers

seized "[m]iscellaneous paperwork located in upstairs office," as described in the inventory

prepared by the State Police.  At the time of the search, Hudson believed that this "miscellaneous

paperwork" referred to pieces of mail bearing Flanagan's name that one of the State Police

officers had indicated he would seize as evidence of Flanagan's occupancy of the premises.  In

fact, this "miscellaneous paperwork," as described below, was five file folders containing

journalist's work product relating to Hudson's investigation of security and operational

deficiencies within DHS, TSA and FAMS.

20.     The law enforcement officers who searched Hudson's office left it in disarray,

thus making it impossible for Hudson to ascertain what, if anything, had been taken.  Filing

cabinet drawers and boxes were pulled open, and all of the filing cabinets and boxes that had

been in the closet were moved from their original locations and placed in the center of the room.

**The Washington Times Files Seized from Hudson's Residence**

21.     On or about September 5, 2013, CGIS Agent Bosch contacted Flanagan to inform

him that Hudson could come to Bosch's office and retrieve the "files" taken from Hudson's

home office during the August 6 search.  Until this time, Hudson was not aware that any files or

documents, other than a few pieces of U.S. mail addressed to Flanagan, had been seized from her

residence.  Flanagan told Bosch to call Hudson directly.

22.     When Bosch called Hudson, she demanded to know what files had been removed

from her home office and the reason her files had been seized.  Bosch informed Hudson that he

had taken the files to verify with TSA whether it was "legitimate" for Hudson to have the

information contained in those files.

23.     It was not until Bosch returned five file folders to Flanagan on September 10,

2013 that Hudson learned what specific documentary materials were seized by the law

enforcement officers during the August 6 search of her residence.  The first file folder, labeled

"FAMS Ballistics/PDA," contained information regarding a story Hudson had written about the

firearms used by FAMS agents during air travel.  *See Air marshals warn their bullets are too

powerful*, Wash. Times, June 13, 2006, at A01, *available at* http://www.washingtontimes.com/

news/2006/jun/13/20060613-123248-2105r (attached hereto as Exhibit F).  One or more of the

individuals named in documents within this file folder are confidential sources who were

working, or had worked within DHS, TSA, and/or FAMS.  The documents also contained information that these sources had provided to Hudson.

24.     The second file folder, labeled "FAMS," contained Hudson's general research regarding FAMS operations and FAMS press relations.  The file folder contained communications from one or more confidential sources.

25.     The third file folder, labeled "Redacted Report FAMS," contained a redacted, publicly available copy of the U.S. House of Representatives investigative report regarding FAMS.  This investigation, as noted above, was conducted following Hudson's story in The Washington Times which detailed how federal air marshals were protecting less than 10 percent of domestic and international flights during the month of December 2004.  *See Flight marshal numbers disputed* [Ex. B].  Additionally, the file contained a memorandum from Hudson to an editor at The Washington Times outlining Hudson's concern that some of her confidential sources were being retaliated against by DHS, TSA and/or FAMS.  Hudson also authored a story for The Washington Times regarding retaliatory action that had been taken by DHS against whistleblowers within FAMS.  *See Marshal files suit, gets his job back, had criticized federal agency*, Wash. Times, Apr. 26, 2005, at A12, *available at* http://www.washingtontimes.com/ news/2005/apr/25/20050425-095008-1578r (attached hereto as Exhibit G).  One or more of the individuals named in documents within this file folder are confidential sources who were working, or had worked within DHS, TSA, and/or FAMS.

26.     The fourth file folder, labeled "Syrian Musicians," contained information regarding suspicious activities of passengers during flights.  Hudson authored several stories for The Washington Times regarding these incidents.  *See Scouting jetliners for new attacks*, Wash. Times, July 22, 2004, at A01, *available at*  http://www.washingtontimes.com/news/2004/jul/

21/20040721-101403-1508r; *Passengers describe flight as a terrorist dry run*, Wash. Times,

Apr. 27, 2005, at A09, *available at* http://www.washingtontimes.com/news/2005/apr/26/

20050426-105951-8168r; *TSA protects report on feared terror practice*, Wash. Times, Apr. 25,

2006, at A03, *available at* http://www.washingtontimes.com/news/2006/apr/24/20060424-

104210-4880r (attached hereto as Exhibit H). The first two documents in the file folder are

letters on DHS letterhead releasing information to Hudson pursuant to a Freedom of Information

Act ("**FOIA**") request. Included with these letters were reports and documents Hudson had

obtained from DHS under FOIA and which are clearly labeled as such.

27.     The fifth and last file folder, labeled "Marshal #s," contained information Hudson

acquired from confidential sources regarding the number of air marshals FAMS employed during

certain time periods. Hudson authored a story for The Washington Times regarding this topic.

*See Air marshals' coverage said inflated* [Ex. C]. One or more of the individuals named in

documents within this file folder are confidential sources who were working, or had worked

within DHS, TSA, and/or FAMS.

28.     When the files folders were returned to Hudson, they were contained in a clear

evidence bag, along with a Maryland State Police Chain of Custody Log. *See* Custody Log

(attached hereto as Exhibit I). The Custody Log identifies the five file folders as "Item #27

Misc. Documents." *See id.*

29.     The Custody Log contained only four entries, two of which record the seizure of

the files on August 6, 2013 and their delivery to the State Police Evidence Room the same

morning. *See id.* The Custody Log does not indicate that any of the file folders were ever

removed from the State Police Evidence Room for inspection or analysis by the Maryland

authorities in connection with their investigation of alleged firearms violations by Flanagan. *See*

*id.* Rather, the two other entries on the Custody Log show that only CGIS Agent Bosch accessed the file folders. *See id.* The Custody Log shows that Bosch first removed the file folders from the State Police Evidence Room on September 3, 2013, nearly a month after the initial seizure, and returned the file folders to the Evidence Room an hour later. *See id.* The Custody Log also shows that the file folders were released by State Police Evidence Room personnel to Bosch on September 5, 2013, the date on which Bosch notified Flanagan that Hudson could retrieve her files from Bosch at his office.

30.     The Custody Log does not show, and it is not otherwise known, whether Bosch or other law enforcement officers made photocopies of the documents contained in the five file folders. Nor is it known whether Bosch or other law enforcement officers made notes of – or otherwise recorded in other CGIS, DHS, TSA or FAMS reports, files or communications – the confidential information contained in the five file folders seized from Hudson's home office. Finally, it is unknown whether CGIS Agent Bosch seized other file folders or information not recorded in the Custody Log.

## ARGUMENT

"Federal magistrates should be aware that unrestricted power of search and seizure [can] be an instrument for stifling liberty of expression. Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978). Following the Supreme Court's decision in *Zurcher*, Congress enacted the Privacy Protection Act of 1980 which made it unlawful "for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product

materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper." 42 U.S.C. § 2000aa (West 2013).

It is well-established in this Circuit that "[w]hen a search is conducted pursuant to a warrant, it 'is limited in scope by the terms of the warrant's authorization.'" *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010); *see also United States v. States v. Phillips*, 588 F.3d 218, 223 (4th Cir. 2009). Although "a search warrant is not to be assessed in a hypertechnical manner," *United States v. Srivastava*, 540 F.3d 277, 289 (4th Cir. 2008), "[w]hether seized evidence falls within the scope of a warrant's authorization must be assessed solely in light of the relation between the evidence and the terms of the warrant's authorization," *Williams*, 592 F.3d 511, 520-21 (4th Cir. 2010); *United States v. Oloyede*, 982 F.2d 133, 141 (4th Cir. 1992) ("government may not seize legitimate files even when it has evidence of an extensive fraud scheme in one particular area of the business"); *United States v. Berlin*, 707 F. Supp. 832, 838 (E.D. Va. 1989) (finding warrant authorizing seizure of documents related to defendant's procurement of two defense contracts did not authorize seizure of notebook that contained notes concerning defense contract not listed in warrant).

Thus, when "documents not covered by the warrant are improperly seized, the government should promptly return the documents." *Williams*, 592 F.3d at 520; *see also Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976) ("to the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others").

The seizure of the file folders containing Hudson's journalist's work product and proprietary information belonging to The Washington Times was unlawful for a number of reasons. First, no reasonable reading of the Warrant gave Bosch or the State Police the authority

to seize the file folders.  The Warrant, by its own terms, permitted only the search for and seizure

of firearms, related accessories, or other evidence of the allegedly unlawful possession of

firearms by Flanagan.  Nothing on the face of the file folders indicated that the contents related

in any way to Flanagan's possession of firearms, so there was no basis for the law enforcement

officers to open and inspect the file folders during the search, much less to seize the contents.

Simply put, the inspection and seizure of these file folders fell outside the scope of the Warrant.

*See Williams*, 592 F.3d at 520.

Second, the contents of the file folders plainly related to Hudson's work as a journalist.

When the search commenced, Bosch confirmed that Hudson was a journalist and that she had

written stories about FAMS.  Thus, he and the other law enforcement officers conducting the

search were on notice that Hudson's files may contain privileged journalist's work product that

was beyond their authority to seize.  42 U.S.C. § 2000aa (West 2013) (it is unlawful "for a

government officer . . . to search for or seize" such work product).  When Bosch returned the

originals of the file folders a month after their seizure, he sought to justify his unlawful seizure of

those materials by claiming that he needed to determine with TSA whether it was "legitimate"

for Hudson to have the information contained in her file folders.  This proffered justification was

pure pretext.  First, to the extent that one of the file folders contained government documents, it

was clear on the face of those documents that they were obtained by Hudson pursuant to a FOIA

request.  The documents were attached to official DHS letterhead and FOIA coversheets

indicating that Hudson had obtained the documents through appropriate and official channels.

In any event, the vast majority of the materials contained in the file folders were clearly

not government documents at all.  The file folders are full of handwritten or typewritten notes

and memoranda Hudson had produced in her work for The Washington Times.  Even a cursory

review would reveal that these materials were not government property but rather were the intellectual property of The Washington Times.

Given Bosch's questions during the execution of the Warrant surrounding Hudson's work as a journalist for The Washington Times, the complete lack of any relationship between Hudson's work product and the alleged offense for which the Warrant was issued, and the timeline provided by the Custody Log, Movants have substantial reason to believe that the information contained in the five file folders seized from Hudson's home office  has been disseminated to or within CGIS, DHS, TSA, FAMS and/or possibly other federal authorities.

"Movants are persons aggrieved by an unlawful search and seizure of property or by the deprivation of property." Fed. R. Civ. P. 41(g).  The materials seized from Hudson's home office were property belonging to Hudson and The Washington Times which they were lawfully entitled to possess.  The burden now shifts to the government to show that it either no longer possesses the illegally seized materials, including any information derived therefrom, or that there is a legitimate reason for the government to retain the information.  Given the substantial risk that CGIS Agent Bosch has retained or disseminated information derived from the illegally seized materials, the Court must take testimony from Agent Bosch in order to determine whether that has occurred.  Fed. R. Crim. P. 41(g).

## CONCLUSION

For all of the foregoing reasons, Hudson and The Washington Times respectfully request that this Court grant the Motion for Return of Property.  Further, Movants request that this Court direct the government to return all photocopies of the illegally seized documents, and to submit to the Court all records of any kind in the possession or control of the government containing

information derived from the unlawfully seized materials so that those records may be destroyed under the Court's supervision.

**REQUEST FOR HEARING**

There are factual issues incident to this Motion for Return of Property that require this Court to receive and review evidence. *See* Fed. R. Crim. P. 41(g).  Pursuant to Local Rule 105.6, Movants hereby request a hearing to present oral argument and evidence on this Motion for Return of Property.

Respectfully submitted,

Dated: November 21, 2013                    By: _____
                                            Charles S. Leeper (Bar No. 07296)
                                            Allen V. Farber (Bar No. 04349)
                                            DRINKER BIDDLE & REATH LLP
                                            1500 K Street N.W.
                                            Suite 1100
                                            Washington, DC  20005-1209
                                            Telephone:  (202) 842-8800
                                            Facsimile:   (202) 842-8465
                                            Email:       Charles.Leeper@dbr.com
                                                         Allen.Farber@dbr.com

                                            *Attorneys for Movants*
                                            *Audrey Hudson*
                                            *The Washington Times, LLC*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Return of

Property, Memorandum in Support of Motion for Return of Property, and Order Granting

Motion for Return of Property was served via Federal Express, overnight delivery, on this 21st

day of November, 2013 upon:

> Allen F. Loucks,
> Assistant U.S. Attorney
> Chief, Civil Division
> 36 South Charles Street
> Baltimore, MD 21201 - 2692

Charles S. Leeper